

November 7, 2024

**Via CM/ECF**

Maureen W. Gornik, Acting Clerk of the Court
United States Court of Appeals, Eighth Circuit
Thomas F. Eagleton Courthouse
111 S. 10th Street, Room 24.329
St. Louis, MO 63102

    **RE:** **Notice of Submission of Standing Declarations –** *Clean Water Action et al. v. Michael S. Regan, Administrator, United States Environmental Protection Agency, et al.***, Nos. 24-2246, 24-2255, and 24-2407**

Dear Ms. Gornik,

    Pursuant to your office's instructions, I write on behalf of Environmental Petitioners in the above-captioned cases to submit as attachments to this letter the standing declarations referenced in their opening brief (ECF Doc. 5454473). Environmental Petitioners submit these declarations solely to satisfy their burden to demonstrate their standing to bring their cases under Article III of the U.S. Constitution.

    Consistent with the Court's Local Rules, Environmental Petitioners will not be submitting any paper copies of these declarations or this letter along with their opening brief but are available to do so at the Court's request. Thank you.

    Respectfully submitted,

    */s/ Thomas Cmar*
    Thomas Cmar
    Earthjustice
    6608 Wooster Pike
    Cincinnati, OH 45227
    (312) 257-9338
    tcmar@earthjustice.org

Mychal Ozaeta
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
(213) 766-1069
mozaeta@earthjustice.org

Lauren Piette
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org

*Attorneys for Petitioners Clean Water
Action, Sierra Club, Diné Citizens
Against Ruining Our Environment,
Waterkeeper Alliance, Inc., and
Natural Resources Defense Council*

*Clean Water Action*

# DECLARATION OF BECKY SMITH

I, Becky Smith, declare as follows:

1. My name is Becky Smith. I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information.

2. I live in Houston, Harris County, Texas, 77098 with my spouse and my daughter, who is in elementary school. I have lived at my current address since 2018.

3. I am employed by Clean Water Action. I serve as the organization's Texas State Director. My responsibilities in this role include directing and conducting campaign work to protect water quality and working to prevent pollution from myriad sources. Campaign work includes participation in coalitions and educating our members about opportunities to weigh in on public input processes regarding issues such as water permitting at the state level and also delivering testimony on behalf of our membership to decision-making bodies such as the Texas Legislature. I have been in this role since 2022.

4. In addition to my current role, I have worked for, and been a member of, Clean Water Action on and off since 2001. I am a member of Clean Water Action today.

5. I joined Clean Water Action because I care about protecting and preserving our environment and keeping waters flowing and clean for all flora and fauna. This includes protecting waters for human use and recreation. I want safe water for myself, my family, and everyone around us. As a person that uses nature to soothe myself, it is important to me to have healthy outdoor spaces to visit.

6. I regularly spend time outdoors in the Brazos River Basin in Brazos Bend State Park. I visit the Park at least a couple of times a year, at all different times of the year. I often go with my family. While there, I enjoy observing the wildlife in the river, including alligators and turtles, as well as migratory birds. I also like to hike along the river and climb the lookout tower to see the riverscape.

7. My family and I also visit the Brazos River Basin about once a year with other families who are members of the Scouts BSA. My child is going into her fourth-grade year of BSA. We join her and other families on camping trips in the Brazos Bend State Park. A lifelong goal for me as a parent is to build a sense of wonder for nature in my child. Every minute she's out in nature is a huge victory. I think it is setting her on a life-long course of discovery and joy. Having healthy outdoor spaces to visit, and healthy plant and animal life to observe, is important to me as a parent.

8. I am aware that the W.A. Parish power plant discharges its coal ash wastewater into Smithers Lake, which is part of the Brazos River Basin located upstream of Brazos Bend State Park. I am also aware that coal ash wastewater includes toxic contaminants, like mercury, arsenic, lead, and selenium.

9. I am concerned about mercury and other heavy metals that build up in fish and the impact those contaminants could have on my health and my family's health. As a woman of childbearing age, I've strictly limited my fish consumption because of mercury poison concerns. I also really try to limit my child's exposure to polluted water. Where we go for recreation and what waters we eat from are affected by my knowledge of where pollution sources are, including the W.A. Parish plant.

10. I am also concerned about heavy metals impacting species, including threatened and endangered species. I am especially fond of Whooping Cranes, which I sometimes see and like to observe when I visit the Park. I understand that heavy metals in water can negatively affect their eggs. As a mom, that feels personal, and it makes me wonder how it affects human reproduction.

11. My concerns about the impact of heavy metals on my health, my family's health, and the health of the species I like to observe affects my aesthetic and recreational enjoyment of the Brazos Bend State Park and Brazos River Basin.

12. I know that the U.S. EPA recently issued a new rule that will require the W.A. Parish plant to eliminate its discharge of two large wastewater streams. I am aware that those wastewater streams are significant sources of water

pollution, including the heavy metals I am concerned about, and I am glad that the new rule requires W.A. Parish to eliminate them.

13. However, I understand that the new rule would allow W.A. Parish to avoid these new requirements and continue discharging its wastewater from these two large wastewater streams if it retires before 2034. I also understand that the new rule would allow W.A. Parish to continue discharging another wastewater stream, known as "unmanaged" leachate, regardless of whether it retires before 2034. I am concerned about the possibility of W.A. Parish continuing to discharge its toxic wastewater.

14. If the new rule is implemented and W.A. Parish is required to eliminate its discharges, I would feel safer recreating in the Brazos River Basin in Brazos Bend State Park. I also would have a more positive experience in the Park knowing that the rule is positively impacting the species I like to observe by reducing water pollution.

15. By contrast, if the new rule is not implemented, or if the new rule is implemented with loopholes that allow W.A. Parish to keep discharging large amounts of polluted water, I worry that there will be less wildlife to see in the Park. We would visit the Park less if there were fewer healthy species to observe. The Scouts would probably visit less frequently too.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated October 1, 2024.

Becky Smith

_____

Becky Smith

# DECLARATION OF LYNN THORP

I, Lynn Thorp, declare as follows:

1. I am the National Campaigns Director for Clean Water Action. I have worked for Clean Water Action in this position for over 25 years.

2. In my role, I oversee all of Clean Water Action's national campaigns, which include policy research and advocacy around national environmental and public health laws, with an emphasis on the Clean Water Act and Safe Drinking Water Act.

3. Clean Water Action is a national, non-profit membership organization incorporated under the laws of the District of Columbia, with its principal place of business in Washington, D.C. We conduct campaigns on the national level as well as state and local campaigns in offices around the country.

4. Clean Water Action's mission includes prevention of pollution in the nation's water, protection of natural resources, creation of environmentally-safe jobs and businesses, and empowerment of people to make democracy work. Our activities include policy research and advocacy, public education and grassroots mobilization. We have been involved with the Clean Water Act since our founding in 1972 and with implementation activities throughout the Act's history. Our core programs have always included efforts to strengthen the Act's implementation and enforcement and to work toward the Act's goal of zero discharge pollution into waters of the United States.

5. For over a decade, one of Clean Water Action's priority campaigns has been advocating for the U.S. EPA to finalize a rule establishing stringent revised Effluent Limitation Guidelines for steam electric power plants ("the ELG Rule"). During the 2013 public comment period for the proposed ELG Rule, Clean Water Action filed comments signed by over 200 national, state, and local public interest organizations and collected nearly 45,000 comments from our members and other supporters, which called on EPA to finalize an ELG Rule that would require steam electric power plants to eliminate discharges of bottom ash, fly ash, and flue gas desulfurization wastewater. That same year, Clean Water Action contributed to and co-released a major report on the extent of water pollution coming from steam electric power plants across the country,

*Closing the Floodgates: How the Coal Industry is Poisoning Our Water and How We Can Stop it.*

6.  Since 2013, Clean Water Action has continued advocating for a strong ELG Rule.  For example, Clean Water Action joined comments filed on January 21, 2020 on the proposed amendments to the ELG Rule (84 Fed. Reg. 64,620 (Nov. 22, 2019)) and subsequently joined a petition for review of those amendments when they were finalized in 2020 (85 Fed. Reg. 64,650 (Oct. 13, 2020)).  We also joined comments filed on May 30, 2023 on the most recent proposed amendments to the ELG Rule (88 Fed. Reg. 18,824 (Mar. 29, 2023)), which are at issue in the present litigation.  In addition, we have contributed to other reports and communicated with members and the public about the importance of this issue. In particular, Clean Water Action has been focused on the impacts of power plant water pollution on our drinking water, including the impacts on municipal drinking water utilities that are forced to invest in additional treatment of source waters due to the impacts of upstream power plant pollution.

7.  Since EPA published the most recently revised ELG Rule, at issue in this litigation, Clean Water Action has been analyzing how the rule may be implemented and what role our organization will play to ensure the rule is implemented effectively.  We support the new and stronger limits in the recently revised ELG rule, which requires most steam electric power plants to upgrade wastewater treatment technology to achieve zero discharge of pollutants from bottom ash transport wastewater, flue gas desulfurization scrubber sludge, and combustion residual leachate. We believe these stronger limits will result in significant improvements in water quality and public health.

8.  However, we oppose the new rule's exemption from these stronger limits for coal plants that retire or convert by 2034, which allows those plants to continue discharging water pollution subject to prior weaker, limits. We also oppose the new rule's loophole that sets weaker limits that allow coal plants to continue discharging what EPA calls "unmanaged" leachate.

9.  The interests of Clean Water Action and its members would be adversely affected if those two loopholes were to remain.  Those loopholes would reduce and/or delay water quality and public health protections from which our

members would benefit, and pollution from steam electric power plants would continue to harm waters of the United States that our members use and enjoy.

10. When an individual becomes a member of Clean Water Action, his or her current residential address is recorded in our membership database. This database is regularly updated to add new members, reflect address changes, and change membership status for those who are no longer active members.

11. Clean Water Action currently has more than 154,000 members nationwide.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated October 18, 2024.

_____

Lynn Thorp

*Sierra Club*

## DECLARATION OF LORI MCKIERNAN

I, Lori McKiernan, declare as follows:

1. My name is Lori McKiernan. I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information.

2. I live on South Whittier Avenue in Springfield, Illinois, about 3.5 miles northwest of City Water, Light, and Power's ("CWLP") Dallman coal-fired power plant. I have lived there for two-and-a-half years. I am retired.

3. I have been a member of Sierra Club for over a year. My membership is current. I joined because I care about water pollution, eliminating fossil fuels, and transitioning to renewable energy. I serve on the Executive Committee for the Club's Sangamon Valley Group and lead the clean transportation work for the Club's Illinois Chapter. I am also very involved in advocacy related to Dallman Unit 4. The Sierra Sangamon Valley Group monitors CWLP ordinances that involve water, the Dallman coal plant, and a transition to clean energy. We research and assess the proposals and speak out at City Council meetings when we have concerns about the requested actions. One of the environmental issues I am most focused on is clean water. That's in part because I know Dallman Unit 4 discharges its wastewater into our drinking water supply. The toxins in the wastewater that is discharged from Dallman 4 is a concern to our group.

4. I like to hike and observe nature around Lake Springfield and the Sangamon River. I do so about 4-6 times a year. I especially enjoy bird watching; I'm trying to learn about the birds that frequent Central Illinois. I always keep an eye and ear out for birds during those events. I'm aware of the impact of polluted water on our local wildlife. The impact of this pollution on the health and diversity of wildlife impacts humans. This is always on my mind as a problem during my hikes.

5. I am aware that CWLP sends some of its wastewater to the water reclamation district, and I am aware that some of its coal ash pollution seeps into the groundwater. I know this pollution contains toxic contaminants. I know about this water pollution from being part of Sierra Club and from following information about the issue. I know this water pollution is a threat to our drinking water and that something needs to be done about it. I am extremely frustrated that CWLP and the City of Springfield aren't doing more to protect Springfield's citizens from environmental pollution.

6. I am concerned about how Dallman's water pollution impacts me and my community. It is stressful thinking about the potential impacts of all these toxic chemicals. I don't have much choice over my water supply. I am concerned about the presence of toxic contaminants in my water. I pay attention to any incident that could cause a failure in the City's water treatment system. I also worry about the people who live on Lake Springfield and spend time in the water.

7. In addition, I am concerned about how Dallman's water pollution impacts our ecosystem. I would not eat fish from the Sangamon River because of my concerns about water pollution. Additionally, I care about a healthy population of birds—both because I like to observe them and because I believe biodiversity is important. When I go hiking near Lake Springfield and the Sangamon River, concerns about water pollution diminish my enjoyment of bird watching. I worry about how pollution could impact them.

8. I am aware that the U.S. EPA recently issued a new rule that will require the Dallman plant to eliminate its discharge of two wastewater streams (FGD wastewater and managed coal ash leachate). I know these wastestreams contain toxic pollution. It's very concerning to me that CWLP has filed a lawsuit challenging the new rule's limits on FGD wastewater.

9. However, I understand that the new rule would allow Dallman to avoid these new requirements and continue discharging its FGD wastewater and managed coal ash leachate if it retires before 2034. I am concerned about the possibility of Dallman continuing to discharge this toxic wastewater. I also understand that the new rule would allow Dallman to continue discharging another wastewater stream, known as "unmanaged" leachate, regardless of whether it retires before 2034. While I am glad that the new rule would at least require Dallman to reduce its unmanaged leachate, I am concerned that the rule does not require Dallman to eliminate it altogether.

10. If the new rule is implemented, and Dallman is required to eliminate its wastewater pollution, I would be less stressed about the potential impact to my drinking water supply, my health, and the health of my community. I would definitely get out and enjoy Lake Springfield and the Sangamon River more, especially because I would be better able to enjoy bird watching at those water bodies.

11. By contrast, if the new rule is not implemented, or if the new rule is implemented with loopholes that allow Dallman to keep discharging large amounts of polluted water, it would not reduce my concerns. Without this rule, and strong requirements under which Dallman must eliminate its discharges, I do not believe CWLP will be held accountable for its pollution. I find that very frustrating and stressful. I also worry about how continued contamination of Lake Springfield and the Sangamon River could impact wildlife. Wildlife is part of the basis of our environmental system. If our environmental system is being damaged, it damages all of us.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated October 4, 2024.

Lori McKiernan

# DECLARATION OF MICHELLE HAYNES

I, Michelle Haynes, declare and state as follows:

1.      My name is Michelle Haynes. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2.      I am a life member of the Sierra Club and the Tennessee Native Plant Society, and I am a member and past chair of Tennessee Conservation Voters, and I was twice appointed commission member of the Tennessee Conservation Commission under Tennessee Department of Environment and Conservation ("TDEC"). I have also been a member of the Tennessee Clean Water Network ("TCWN") since 2012. I do this work and support these organizations to help protect our state's water quality, which is very important to me.

3.      For approximately 40 years, my husband and I lived onLock Four Road, Gallatin, Tennessee 37066, which was about one-half mile downstream of the Tennessee Valley Authority's Gallatin coal-fired power plant. This plant includes a series of unlined coal ash surface impoundments used to settle out toxic pollutants contained in Gallatin's coal combustion wastewaters. These vast ash impoundments abut Old Hickory Lake, a reservoir of the Cumberland River. I moved to this address in 1985 with my husband and raised three children on Old

1

Hickory Lake. I have been a resident of Sumner County since 1972 and have spent time recreating on and around Old Hickory Lake the entire time.

4.      Although we sold our property on Old Hickory Lake three months ago, my family and I regularly spend time on the lake when friends ask us to go boating. While we intend to continue spending time recreating on the lake, I do be not plan to swim in Old hickory lake because of the pollution in the lake caused by facilities like the Gallatin power plant.

5.      I understand that coal-burning power plants like Gallatin produce voluminous amounts of coal ash and contaminated wastewater. That coal ash and wastewater contain many toxic pollutants, including arsenic, cadmium, hexavalent, chromium, selenium, lead, mercury, and thallium.  I understand that these hazardous pollutants can cause serious injury to human health, including cancer, and respiratory, developmental, reproductive, and neurological harm.  I also understand that these chemicals are toxic to fish and wildlife.

6.      I learned to waterski in front of the Gallatin plant in 1970.  I grew up boating, fishing, swimming, waterskiing, and enjoying one of the community's most precious resources, Old Hickory Lake.  As a parent, I taught my children to enjoy our beautiful lake and at the same time to preserve its quality and natural beauty.  As former landowners and current community members, we have tried to

Appellate Case: 24-2246    Page: 15    Date Filed: 11/07/2024 Entry ID: 5454499

preserve and protect the water quality as do many of the residents of Sumner County. We know our water is precious.

7. Pollution of the water will hurt our health, our enjoyment of the lake, the environment, and the county's economy. It is my understanding that the Gallatin power plant discharges contaminated wastewater to the Cumberland River and Old Hickory Lake. Based on my understanding of the chemicals in those wastewater streams, I fear that the Gallatin plant's discharges has contaminated waters that I use.

8. The town of Gallatin's drinking water supply is taken downstream from the Gallatin plant. My family and I drink and bathe in this water. Many farmers use the water for livestock and crops. Local restaurants serve catfish caught locally and fishermen catch fish from the lake to feed their families. I have eaten fish caught from the lake from time to time, but in recent years I avoid doing so because of concerns about pollution from the power plant.

9. Because the water quality of Old Hickory Lake affects me on a daily basis, I am deeply concerned that the Gallatin plant discharges dangerous chemicals into the Cumberland River. I understand that the U.S. EPA recently issued a new rule limiting the amount of toxic pollution contained in wastewater discharged by coal plants like Gallatin into waterbodies like the Cumberland River and Old Hickory Lake. I know that the new rule prohibits the discharge of coal ash

3

and "scrubber" wastewater, and also prohibits the discharge of some wastewater that percolates through ash impoundments and landfills (which is known as leachate). I support these aspects of the new rule because they are intended to protect human health, fish and wildlife, and waters like the Cumberland River and Old Hickory Lake, which I use and enjoy.

10. However, I also understand that the new rule allows plants like Gallatin, which is set to retire in 2031, to avoid these new requirements and to instead continue discharging large volumes of contaminated water. I also understand that the new rule allows plants, including Gallatin, to continue discharging certain types of leachate (which the new rule refers to as "unmanaged" leachate). I oppose these aspects of the new rule because they allow Gallatin to continue discharging dangerous pollution into the Cumberland River and Old Hickory Lake, which directly impacts my daily use and enjoyment of the river. My family and I would be harmed if Gallatin gets a free pass on the new rule's prohibition against discharging contaminated wastewater and certain leachate. We would also be harmed if Gallatin is allowed to continue discharging "unmanaged" leachate. For that reason, I support Sierra Club's litigation.

12. I am very concerned about the impacts of these untreated coal ash and wastewater contaminants on the Cumberland River and Old Hickory Lake. Without adequate treatment or prohibition on this type of pollution from the

4

Gallatin plant, I feel as though it is dangerous to swim, fish, or drink the water either upstream or downstream of the Gallatin power plant and its ash ponds. Indeed, in recent years, I have limited my own and my family's exposure to the water near the Gallatin coal pond, as well as to eating fish from the river.

13. I support Sierra Club's lawsuit because I believe it would go a long way towards eliminating the discharge of toxic pollution from the Gallatin power plant into the Cumberland River and Old Hickory Lake, and it would improve my own and family's use and enjoyment of the river and lake.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated October 4th, 2024.

Michelle Haynes

# DECLARATION OF HUDA FASHHO

I, Huda Fashho, state and declare as follows:

1.      I am over 18 years old and have personal knowledge of the matters set forth in this declaration.

2.      I am a Sierra Club employee. My current title is Senior Managing Director, Member Care. I have held this position for approximately five and a half years.

3.      In that role, I manage aspects of Sierra Club's customer service, including maintaining an accurate list of members and managing the organization's member databases.

4.      When a person becomes a member of Sierra Club, that person's current residential address or contact information is recorded in our membership database. This database is regularly updated to add new members, reflect address changes and contact information, and update membership status.

5.      Sierra Club is a national non-profit member-based public interest organization incorporated under the laws of the State of California, with its principal place of business in Oakland, CA.  It is a recognized not-for-profit corporation under Section 501(c)(3) and (c)(4) of the U.S. Internal Revenue Code. Sierra Club is further subdivided into local chapters, groups, committees, and task forces, with a presence in every state in the Nation.

6.      The Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives.  Its activities also include public education, advocacy, and litigation to enforce environmental laws, including advocacy and litigation to protect public health and air and water quality in the communities where our members live, work, and recreate. Sierra Club has a longstanding commitment to ensuring that the Clean Water Act is fully enforced, properly implemented and ultimately used to ensure Clean Water for all Americans, including Sierra Club members, who live, work, recreate, and drink water that can be impacted by industrial pollution.

7.      Sierra Club currently has 600,075 active, dues-paying members. As noted, when a person becomes a member of the Sierra Club, that person's contact information is recorded in our membership database, which is regularly updated to add new members, reflect changes to contact information, and change membership status for those who are no longer active members.

8.      Membership in Sierra Club is granted to any person who provides Sierra Club with a membership application providing their name and pays a membership fee of at least $15. A person is a member from the date that Sierra

Club receives their membership fee.

9.    Sierra Club's membership database shows that Michelle Haynes, a resident of 335 W Main Street, Gallatin, Tennessee 37066, is a lifetime Sierra Club member. According to the database, Sierra Club first received Ms. Haynes' membership fee and added her to the membership list on August 1, 1995.

10.   Sierra Club's membership database shows that Lori McKiernan, a resident of 1504 S Whittier Avenue in Springfield, Illinois is also a Sierra Club member. According to the database, Sierra Club first received Ms. McKiernan's membership fee and added her to the membership list on December 1, 2016.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on October 10, 2024.


_____
Huda Fashho

*Diné Citizens Against Ruining Our Environment*

# Declaration of Robyn Jackson

I, Robyn Jackson, declare as follows:

1. My name is Robyn Jackson. I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information.

2. I reside in Wheatfields, Arizona, within the Navajo Nation. My community is at the base of the Chuska mountains and forest. My mother's side of the family is from this region of the Navajo Nation. I grew up in this area and have lived here for most of my life. Additionally, I have familial connections to the northern Navajo communities of Tse Daa K'aan (Hogback) and Shiprock, New Mexico. My father's side of the family is from this region of the Navajo Nation. I have relatives who continue to live there. Our reservation is located on our tribe's ancestral homeland. I am an enrolled member of the Navajo Nation. I am a registered voter of the Navajo Nation.

3. I am the Executive Director of Diné Citizen Against Ruining Our Environment ("Diné C.A.R.E.").

4. In my role, I am responsible for the organizational leadership and management of our nonprofit organization. My administrative duties include executive oversight of fundraising, communications, project management, and reporting to board members. I serve as the official representative and point of contact in all contracts, litigation, and organizational sign-ons.

5. Diné C.A.R.E. is an all-Navajo environmental justice non-profit organization comprised of grassroots community members active on Navajo Nation lands, including the Four Corners region of Arizona, New Mexico, and Utah. Diné C.A.R.E.'s mission is to advocate for traditional Navajo teachings by protecting and providing a voice for all life within and beyond the Four Sacred Mountains. Diné C.A.R.E. promotes regenerative and sustainable uses of natural resources consistent with the Diné philosophy of life.

6. Since the late 1980s, Diné C.A.R.E. has worked with Navajo communities affected by energy and environmental issues to demand environmental protection and sustainable development practices, bringing systemic changes in tribal politics and making the grassroots voices evident in the realm of energy development.

7. Diné C.A.R.E. has been engaged on coal plant and coal mining pollution issues, including coal ash and water pollution issues related to the Four

Corners Power Plant and other nearby coal plants for over 20 years. We have worked with organizations like Earthjustice to produce reports detailing the extent of contamination at the plant and the failure of the plant operators to assess and investigate groundwater contamination.

8. Prior to becoming the Executive Director in 2022, I was the Interim Executive Director, and before that, I was the Climate and Energy Outreach Coordinator. Previous to that role, I was an Organizer and before that, I periodically volunteered for several years. I have worked and volunteered for Diné C.A.R.E. for over 10 years.

9. I have a Bachelor of Arts Degree in Sociology from Ft. Lewis College. Presently, I am dually enrolled in the Master's of Public Administration Program and graduate certificate program in Indigenous Nation-Building at Northern Arizona University.

10. In 2007, I learned of a proposal to construct Desert Rock Power Plant, which would have represented a third coal-fired power plant on Navajo Nation lands, near the Four Corners Power Plant and San Juan Generating Station. I was concerned about increased air and water pollution, and the social and environmental injustice of further burdening the public's health in this region. Since then, I've been actively involved volunteering and working with various Four Corners and Diné social and environmental justice organizations. I have participated in numerous federal, state, and tribal public hearings, providing public comment in support of stringent pollution standards at these coal-fired plants to protect air quality, water quality, and public health and to promote social and environmental justice and Indigenous community rights.

11. I understand that the Chaco Wash, watershed, and its tributaries are directly affected by the Four Corners Power Plant. The plant discharges pollutants into No Name Wash and Chaco Wash, which in turn drain into the San Juan River.

12. I am also aware that coal ash has been disposed of in unlined coal ash impoundments at the Four Corners Power Plant and documents show coal ash seepage from the impoundments.

13. I have family that live in Shiprock and Hogback, NM, which are near the Four Corners Power Plant and recently retired San Juan Generating Station, downstream the San Juan River that is impacted by the plant's pollution. I visit this area at least 3 times a month. At times, it is to visit my family and

participate in cultural, ceremonial, and spiritual practices. At other times, it is for purposes of my work for Diné C.A.R.E.

14. The San Juan River is culturally regarded as a male river that provides protection and sustenance for our people. Indeed, rivers in the Southwest provide the ability for life to flourish around them. There are 19 northern Navajo communities and many of them that are adjacent to the San Juan River are farming communities that rely on irrigation from the river to sustain their annual crops and traditional foods like corn, beans, squash, and melons. The San Juan River is one of several cultural landmarks that designate our traditional territory.

15. Diné C.A.R.E. members, including myself, still participate in cultural and traditional practices that involve pilgrimages, offerings, and prayers to our sacred mountains, rivers, and springs, at least yearly. The San Juan and Colorado rivers are sacred and serve as the male and female waters that enable life to all living things in the region. Our tribe and communities have a long history in the San Juan Basin.

16. Any pollution and harms to the San Juan River and its tributaries would damage the cultural integrity of our tribe, our Indigenous practices, and the habitat of several endangered fish species, wildlife, and plant life.

17. I am aware that the U.S. EPA recently issued a new rule that will require the Four Corners Power Plant to eliminate its discharge of bottom ash transport water. I know this wastewater contains toxic pollution.

18. However, I understand that the new rule would allow the Four Corners Power Plant to avoid these new requirements and continue discharging this wastestream if it retires before 2034. I also understand that the new rule would allow the Four Corners Power Plant to continue discharging another toxic wastestream, known as "unmanaged" leachate, regardless of whether the plant retires before 2034. I am concerned that the new rule does not require the plant to eliminate its discharges of bottom ash transport water and unmanaged leachate.

19. If the new rule is implemented, and the Four Corners Power Plant is required to eliminate its wastewater pollution, it would positively impact myself and the interests of Diné C.A.R.E. My use of and spiritual and cultural connection to the land, waters, and species as well as the organization's interests would be significantly enhanced.

20. By contrast, if the new rule is not implemented, or if the new rule is implemented with the loopholes that allow the Four Corners Power Plant to

continue discharging large amounts of polluted water, it would not reduce my concerns or harm, but it would instead perpetuate the adverse impact that the pollution from the plant has had on my use of and spiritual and cultural connection to the land, waters, and species and the organizational mission of Diné C.A.R.E.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Date: November 4, 2024                    Signed: *Robyn Jackson*

*Waterkeeper Alliance, Inc.*

# DECLARATION OF HEATHER SPROUSE

I, Heather Sprouse, declare and state as follows:

1. My name is Heather Sprouse. I am over the age of 18. The information in this declaration is based on my personal experience and my review of publicly available information.

2. I live in the Curry District of Putnam County, West Virginia, between the towns of Huntington and Charleston and just over the Kanawha County line. My home is about 11 miles away from the John E. Amos power plant and about 6.5 miles from the banks of the Kanawha River. I have lived at my current home since 2013, and in this area since most of my life. My family has been in West Virginia for at least five generations.

3. I am the Community Engagement Manager for the West Virginia Rivers Coalition, also called WV Rivers, which is part of Waterkeeper Alliance, Inc. Our mission is to conserve and restore West Virginia's exceptional rivers and streams. I have been in my role for just over two years. In this role, I manage WV Rivers organizers; help to develop an organization-wide approach to community engagement; serve as one of the organization's media contacts for representing community voices; and develop training materials about how the public can more easily engage with environmental permitting processes and agencies.

4. I have also been a member of WV Rivers since May 2023. My membership is current. I got involved with WV Rivers because of my long-standing interest in environmental issues, especially concerns about water pollution. When I was a teenager, I became very concerned about mountaintop removal. Mining issues remain deepest in my heart. More recently, I've become concerned about PFAS. At the core of these concerns is my belief that all West Virginians should have access to safe and clean water.

5. I enjoy outdoor recreational activities, including fishing, kayaking, and swimming. I have been fishing and kayaking recreationally for about 8 years. Today, I fish and kayak about 6 times a year and plan to continue doing so in the future.

6. Currently, I have to drive quite far away from my home in order to find safe areas to fish and kayak, even though I am very close to the Kanawha River. For example, we sometimes kayak on the Coal River, which is about 20 miles from our

1

house. However, because that river also has significant water quality issues related to coal mining, we do not swim or fish for consumption from that river. Instead, we travel out of state where we can feel safe eating what we fish—for example, we have traveled to tributaries of the Great Lakes as well as the Pine Island area of Florida. We go to Florida every year to kayak, boat, and fish, and we are able to eat the fish year. We go yearly in large part because we feel we can't do those activities safely in West Virginia.

7. I grew up in this area, and I have never felt safe recreating in the part of the Kanawha River close to my home, near the John E. Amos power plant. The plant is huge and notorious, and you can see it from almost anywhere near here. I can see it from the grass fields of my in-laws' farm, which is about 14 miles away from the plant, where my family and I often spend time. My daughter grew up calling the plant the "cloud factory" because of seeing the steam coming from the plant's smokestacks. It's unpleasant to even walk near or drive past the power plant. I am constantly concerned about how pollution from the plant, including water pollution, impacts ecology and aquatic life. I'm also very worried for my neighbors who live downstream from the plant. Flooding is an increasing concern in the area, and I think a lot about what it would mean for homes to flood with water contaminated by pollution from the John E. Amos plant.

8. To date, I would never consider fishing downstream of the John E. Amos plant because of my concerns about water pollution from the plant. Not even catch-and-release feels safe, let alone fishing for subsistence. Similarly, swimming downstream of the plant has never been an option. Because of my concerns about water pollution, I feel unsafe recreating in the stretch of the Kanawha even many miles downstream of the power plant, down to the point where it flows into the Ohio River.

9. I would love to have a relationship with the Kanawha River, especially the part of the river that is near my home. It would be incredible to feel safe recreating there. I am envious of the communities that can go out and enjoy their water resources. That has never been an option where I live. Instead, you always have to drive somewhere to get access to waterbodies that are safe to recreate in. Knowing other communities are taking steps to clean up and protect their ecosystems makes me feel frustrated about the situation where I live. I feel robbed of this resource— access to the Kanawha River to use and enjoy—all the time. I live in an area where there are broad concerns about water quality, and water pollution from the John E. Amos plant specifically is a huge piece of the puzzle.

10.  When I think about the John E. Amos plant, what concerns me most is water pollution.  I know that the plant has unlined ponds of coal ash slurry and leachate, and I know they've been unlined for years and years.  Pollution from the plant's unlined slurry pond is top of my mind.  I am aware that pollution is discharged directly into the Kanawha River.

11.  I am aware that the U.S. EPA recently issued a new rule that will require the John E. Amos plant to eliminate its discharge of three of its toxic wastewater streams into the Kanawha River.  I understand that these wastestreams contain pollutants like arsenic, mercury, selenium, and lead, among others.  These pollutants, and my concerns about how they can impact human health, are why I don't feel safe recreating in the Kanawha River downstream of the John E. Amos plant.

12.  However, I understand that the new rule would allow the John E. Amos plant to continue discharging a fourth toxic wastestream, which EPA calls "unmanaged" leachate.  I am concerned about the Amos plant continuing to discharge this pollution.

13.  If the new rule is implemented, and John E. Amos is required to eliminate its major discharges of wastewater pollution, I would feel safer kayaking and catch-and-release fishing in the part of the Kanawha River downstream of the John E. Amos plant.  I would definitely use and enjoy that stretch of the river more.

14.  By contrast, if the new rule is not implemented, or if the new rule is implemented with the loophole that allows John E. Amos to keep discharging unmanaged leachate, it would not reduce my concerns.  I would have to continue traveling far away from my home in order to feel safe fishing and kayaking.  I also would continue to feel worried about how the plant's pollution is impacting our ecology and aquatic life, and how flood waters contaminated by John E. Amos's water pollution could impact my community.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated October 14, 2024.

*Heather N. Sprouse*

Heather Sprouse

3

## DECLARATION OF DANIEL E. ESTRIN

I, Daniel E. Estrin, hereby declare and state:

1. I have personal knowledge of the matters stated herein. I am over the age of 18 and suffer from no legal incapacity. I submit this declaration in support of Waterkeeper Alliance, Inc.'s ("Waterkeeper Alliance") Petition for Review of the United States Environmental Protection Agency's ("EPA") final rule entitled *Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, 89 Fed. Reg. 40,198 (May 9, 2024) (to be codified at 40 C.F.R. Pt. 423) (the "2024 Steam Electric ELG Rule"), which Waterkeeper Alliance filed jointly with Clean Water Action, Environmental Integrity Project, Sierra Club, Diné Citizens Against Ruining Our Environment, Natural Resources Defense Council, PennEnvironment, Inc., and Prairie Rivers Network.

2. I am General Counsel and Legal Director of Waterkeeper Alliance. I have held this position for over eight years and I have worked in various capacities with and for the Waterkeeper movement for more than 30 years. My business address is 180 Maiden Lane, Suite 603, New York, New York 10038.

1

3.  In my role at Waterkeeper Alliance, I am responsible for supervising all of Waterkeeper's legal work, including all litigation to which Waterkeeper is a party.

4.  Waterkeeper Alliance is a not-for-profit membership corporation organized under the laws of the State of New York, and a charitable corporation under section 501(c)(3) of the Internal Revenue Code, that strengthens and grows a global network of grassroots leaders protecting everyone's right to clean water. Waterkeeper Alliance currently comprises approximately 300 member Waterkeeper groups on 6 continents.

5.  There are approximately 150 member Waterkeeper groups based in the United States. Waterkeeper Alliance has interests in the matters addressed herein that are aligned with the interests of these members groups and their individual members. Every case that Waterkeeper Alliance brings is brought to support or on behalf of Waterkeeper member groups.

6.  Catawba Riverkeeper, West Virginia Rivers Coalition, and Winyah Rivers Alliance are Waterkeeper member groups in good standing. *See* the accompanying Declarations of Charles Campbell (dated June 18, 2024),

2

Robert Ciminel (dated June 16, 2024), and Heather Sprouse (dated
October 14, 2024), submitted in support of our Opening Brief.

7. Waterkeeper Alliance's organizational model emphasizes grassroots
advocacy. To become a member of Waterkeeper Alliance, prospective
Waterkeeper groups must demonstrate that they will meet organizational
quality standards. Each Waterkeeper group is associated with a particular
body of water or watershed, which represents that group's "jurisdiction."
Waterkeeper groups seek to protect and preserve the quality of the water
resources within their respective jurisdictions by advocating for
compliance with environmental laws, responding to citizen complaints,
identifying problems that negatively affect their waterbodies, and devising
appropriate remedies to address those issues.

8. Waterkeeper Alliance advances its own interests and the interests of its
member Waterkeeper groups and their individual members through a
variety of means, including identifying noncompliance with federal and
state environmental laws and regulations, and bringing that
noncompliance to the attention of regulatory authorities. Waterkeeper
Alliance also brings litigation on behalf of itself and its member
Waterkeeper groups to enforce federal and state environmental laws and

Appellate Case: 24-2246     Page: 33     Date Filed: 11/07/2024 Entry ID: 5454499

regulations when necessary to ensure compliance and to protect aquatic ecosystems and communities from pollution.

9. Through my educational and professional experience, I have gained extensive knowledge about a wide range of environmental topics. These topics include the harmful effects of pollution associated with coal extraction and combustion on aquatic ecosystems and human health.

10. Through my educational and professional experience, I have learned that coal combustion wastewater – including bottom ash, combustion residual leachate ("CRL"), and flue gas desulfurization ("FGD") wastewater – discharged by coal-burning power plants can contain mercury, arsenic, manganese, selenium, chromium, and other toxic pollutants that are harmful to human health and aquatic ecosystems.

11. To achieve its organizational mission of strengthening and growing a global network of grassroots leaders protecting everyone's right to clean water, Waterkeeper Alliance concentrates its work on certain issues that most strongly affect that mission, especially when an issue affects a large number of Waterkeeper groups. One such issue is water pollution resulting from the extraction, transportation, combustion, and disposal of coal and its byproducts. Waterkeeper Alliance staff work with Waterkeeper groups

4

and other partners to investigate coal-related pollution sources and to implement strategies to abate such pollution. The Clean Water Act, and federal and state regulations implementing the Act, are primary tools that Waterkeeper Alliance and its Waterkeeper groups rely on to protect waterways from coal pollution.

12. Waterkeeper Alliance and its member Waterkeeper groups have frequently participated in administrative processes before state and federal agencies, including EPA, concerning proposed Clean Water Act National Pollutant Discharge Elimination System ("NPDES") permits for coal-burning power plants, to urge those agencies to require discharge limits in NPDES permits for coal-burning power plants that are consistent with Clean Water Act requirements.

13. In addition, Waterkeeper Alliance and its member Waterkeeper groups have frequently participated in citizen enforcement suits under the Clean Water Act, including citizen suits against the owners or operators of coal-burning power plants who violate the discharge limits or other terms and conditions of their NPDES permits.

14. I am aware that many of the surface waters that Waterkeeper Alliance aspires to protect, including many surface waters associated with particular

5

Waterkeeper groups – such as Catawba Riverkeeper, West Virginia Rivers Coalition, and Winyah Rivers Alliance – receive discharges from power plants containing coal combustion wastewater, including bottom ash, CRL, and FGD wastewater.

15. I understand that, cumulatively, current discharge limits in NPDES permits for coal-burning power plants allow discharges of billions of pounds of toxic pollution to waterways in the United States each year.

16. I am aware that EPA has adopted a new final rule further strengthening the Steam Electric ELGs after first updating them in 2015. When EPA first proposed to update the Steam Electric ELGs in 2013, Waterkeeper Alliance worked with Waterkeeper groups and partner organizations on comments urging EPA to finalize a strong rule consistent with Clean Water Act requirements. Waterkeeper Alliance also took other steps to advocate for a strong final ELG rule, including working with partner organizations to issue reports on the rulemaking and meeting with the White House Office of Management and Budget and other decision-makers.

17. Since EPA first updated the Steam Electric ELGs in 2015, Waterkeeper Alliance has continued to work closely with Waterkeeper groups and

6

partner organizations to defend the stronger provisions of the rule while also continuing to advocate and litigate for EPA to further strengthen the Steam Electric ELGs consistent with Clean Water Act requirements. Waterkeeper Alliance's advocacy has included moving to intervene in industry challenges to the 2015 rule, working with partner organizations to successfully litigate a challenge to the 2015 rule's CRL and legacy wastewater provisions, and providing comments and pursuing further litigation on both the 2020 and 2024 Steam Electric ELG rules.

18. I understand that the new 2024 Steam Electric ELG Rule will require more stringent treatment, and in some cases complete elimination of discharges, of coal combustion wastewater, including bottom ash, CRL, and FGD wastewater. I also understand that this increased treatment and/or elimination of discharges will prevent significant amounts of toxic water pollution from entering waterways around the country, including in Waterkeeper groups' jurisdictions.

19. However, I also understand that the 2024 Steam Electric ELG Rule exempts coal-burning power plants that retire or convert by 2034 from new and more stringent requirements while also setting weaker limits that

allow all coal-burning power plants to continue discharging what EPA calls "unmanaged" CRL.

20. If these unlawful loopholes in the 2024 Steam Electric ELG Rule's new and more stringent requirements were to remain, damaging water pollution from coal-burning power plants would continue around the United States. This continued damage to waterways would harm the interests of Waterkeeper Alliance, many of our member Waterkeeper groups, and their members.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on October 21 2024 in New York, New York.

Daniel E. Estrin

8


*Natural Resources Defense Council*

# Declaration of Karen Cairns

I, Karen Cairns, declare as follows:

1. My name is Karen Cairns. I am over 18 years old (I am 78). The information in this declaration is based on my personal experience and my review of publicly available information.

2. I live in Louisville, Kentucky. I have lived at my current address since March 2018. Before that, I lived in the Louisville area from 1984 until 2007 (in Louisville 1984-1989, then directly across the Ohio river in Indiana in 1989, then in Louisville 2002-2007).

3. I am retired from my careers as a registered nurse and environmental educator. I was a nurse for 20 years until I retired from that career in 2001. I attended the University of Louisville where I received a Doctorate in Environmental Education in 2001 and worked there for several years. I still do a lot of environmental education in my neighborhood and work with native plant groups.

4. I am a member of the Natural Resources Defense Council ("NRDC"), and my household has donated regularly to NRDC since 2002.

5. I am also a member of Sierra Club and have been a Life Member since the 1970s.

6. In addition, I was a member of the Salt River Watershed Watch, where I did water quality testing for the rivers and creeks that empty into the Ohio River, and I worked with the Louisville Urban Environmental Leadership group.

7. One of the main reasons I joined NRDC and Sierra Club was because I have always been aware of environmental issues. I grew up in a family of biologists who were very concerned about environmental issues. My father, Dr. John Cairns, Jr, was a member of NRDC until he died in 2017. Throughout his career as a limnologist, he worked on issues related to water quality, including problems with effluent or wastewater.

8. I enjoy walking along the Ohio River and Louisville's waterfront every week. We have a waterfront association here and there is a public greenway near my house to the Ohio River. I can walk along the Ohio River to downtown Louisville, and I do that regularly.

9. I am very concerned about environmental justice issues, and we have a number of those in Louisville. I am concerned about air pollution because I had severe asthma from the time I was a child until I was 56 years old. I no

longer have severe asthma but my lungs are hyper-reactive to air quality, so this is very important to me.

10. I am also concerned about water pollution. I worry that the Ohio River is highly contaminated due to power plants, like the Trimble County Generating Station, factories and other industrial sources of pollution in the area. When I go walking along the Ohio River, my concerns about the water pollution diminish my use and enjoyment.

11. I used to enjoy kayaking, but I am no longer able to do so. Even if I were able to do so, I would not kayak or even get into the water in the Ohio River near where I live and recreate because I am concerned about contamination from upstream sources of pollution like the Trimble County Generating Station.

12. I am also concerned about the ways water pollution from the Trimble County Generating Station impacts our ecosystem. I know that people fish downstream in the Ohio River near where I recreate and that they consume the fish that they catch. However, even though I do not fish, I would never consume fish caught in the Ohio River because I am too concerned that it has been contaminated by pollution.

13. I am aware that the U.S. EPA recently issued a new rule that will require the Trimble County Generating Station to eliminate its discharge of FGD wastewater. I know this wastewater contains toxic pollution.

14. However, I understand that the new rule would allow the Trimble County Generating Station to continue discharging another toxic wastestream, which EPA calls "unmanaged" leachate. I am concerned about the Trimble County Generating Station continuing to discharge this pollution.

15. If the new rule is implemented, and the Trimble County Generating Station is required to reduce its contamination of the Ohio River, it would absolutely impact me. I would enjoy recreating around the Ohio River more. Implementation of the new rule would also reduce my concerns about how the Trimble County Generating Station's water pollution is impacting my health, my community, and our ecosystem.

16. By contrast, if the new rule is not implemented, or if the new rule is implemented with the loophole that allows the Trimble County Generating Station to keep discharging unmanaged leachate, this would actually increase my level of concern. It would be difficult to understand why the Trimble County Generating Station is allowed to keep discharging large

amounts of polluted water when there was a substantial opportunity to protect our water quality.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Date: <u>October 24, 2024</u>  Signed:

# DECLARATION OF GINA TRUJILLO

I, Gina Trujillo, declare as follows:

1. I am the Managing Director of Membership at the Natural Resources Defense Council, Inc. (NRDC). I have been directing the membership department since January 1, 2015, and have worked at NRDC in the membership department for more than 30 years.

2. My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3. NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 50l(c)(3) of the United States Internal Revenue Code. NRDC's headquarters are located at 40 West 20th Street, New York, NY 10011.

4. NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." The mission statement goes on to declare that NRDC works "to restore the integrity of the elements that sustain life - air, land, and water - and to defend endangered natural places." NRDC's mission includes the prevention and mitigation of water pollution, to protect NRDC's members' use and enjoyment of natural resources and their own health and safety.

5. Through the Freshwater Ecosystems Team within its Nature Program, NRDC pursues federal and state policies to curb water pollution and protect surface water resources for the benefit of people and wildlife.

6. As a part of these efforts to protect freshwater, NRDC has participated in administrative rulemaking processes and litigation aimed at strengthening pollution discharge standards for steam electric power plants through the effluent limitations guidelines (ELGs). For instance, on January 21, 2020, NRDC joined comments on the amendments to the steam electric ELGs proposed in 2019, 84 Fed. Reg. 64,620 (Nov. 22, 2019). NRDC likewise joined a petition for review to challenge the amendments to the steam electric ELGs finalized in 2020, 85 Fed. Reg. 64,650 (Oct. 13, 2020). And, NRDC joined comments on the amendments to the steam electric ELGs proposed in 2023, 88 Fed. Reg. 18,824 (Mar. 29, 2023), and at issue in the present litigation.

7. NRDC supports the new and more stringent limits in the recently revised ELG rule, which requires most steam electric power plants to upgrade wastewater treatment technology to achieve zero discharge of pollutants from bottom ash transport wastewater, flue gas desulfurization scrubber sludge, and combustion residual leachate. We believe these stronger limits will result in significant improvements in water quality and public health.

8. However, NRDC opposes the weaker limits that the rule establishes for coal plants that retire or convert by 2034 and coal plants that continue discharging what EPA calls "unmanaged" leachate.

9. The interests of NRDC and its members would be adversely affected if these weaker limits were to remain because they would reduce and/or delay water quality and public health protections from which our members would benefit, and pollution from steam electric power plants would continue to harm waters of the United States that our members use and enjoy.

10. When an individual becomes a member of NRDC, his or her current residential address is recorded in NRDC's membership database. When a member renews his or her membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

11. NRDC currently has approximately 477,130 members. There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico.

12. When an individual becomes a member of NRDC, he or she authorizes NRDC to take legal action on his or her behalf to protect the environment and public health.

13. According to NRDC's membership records, Karen Cairns is a current member of NRDC, and her household has regularly donated since 2002.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Gina Trujillo
Gina Trujillo
Signed on October 28, 2024

# *Environmental Integrity Project*

**DECLARATION OF JENNIFER DUGGAN**

I, Jennifer Duggan, declare and state as follows:

1.      My name is Jennifer Duggan, and I am the Executive Director of the Environmental Integrity Project ("EIP").  I am over 18 years of age and suffer from no impairment or disability affecting my ability to give truthful testimony.

2.      I have worked for EIP for approximately ten years and currently serve as EIP's Executive Director.

3.      EIP is a non-profit organization based in Washington, D.C. dedicated to ensuring the effective enforcement of state and federal environmental laws to protect public health and the environment.  EIP's main office is located at 888 17th St. NW, Suite 810, Washington, DC 20006.

4.      EIP's mission is to protect public health and our natural resources by holding polluters and government agencies accountable under the law, advocating for tough but fair environmental standards, and empowering communities fighting for clean air and clean water. EIP's goals are (1) to illustrate through objective facts and figures how the failure to enforce or implement environmental laws increases pollution and harms public health; (2) to hold federal and state agencies, as well as individual corporations, accountable for failing to enforce or comply with environmental laws; and (3) to help local communities obtain the protections of environmental laws.

1

5.     To further this mission, EIP advocates for laws to protect public health and the environment from air and water pollution from coal-fired power plants and other large sources of pollution.  As part of its efforts to ensure effective enforcement of environmental laws, EIP participates in federal and state rulemakings related to water pollution from the utility industry and brings lawsuits to enforce the Clean Water Act on behalf of community and environmental groups that are harmed by coal plant pollution.  In addition, EIP uses public data obtained through public records requests to develop reports, media materials, and litigation briefs that educate the public and decision-makers.

6.     I am aware that the EPA revised federal regulations related to the discharge of pollutants from the Steam Electric Industry, known as the "Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category" ("ELG Rule") in April 2024.  The ELG Rule primarily regulates wastewater from the storage and disposal of the byproducts of coal combustion, generally known as "coal ash."

7.     EIP invests substantial time and effort in documenting ground and surface water pollution caused by coal ash disposal.  EIP uses this information to help ensure that coal-burning power plants comply with state and federal environmental laws, and to advocate for improvements to existing laws to protect human health and the environment from the unsafe disposal of coal ash.  For

example, in 2013, EIP published a report with the Sierra Club and other organizations detailing how coal-burning power plants were frequently discharging wastewater without monitoring of, or limits on, toxic pollution, often into waterways that were impaired for coal ash pollutants. In 2015, EIP published a report with Physicians for Social Responsibility and other organizations explaining that the EPA had underestimated the monetary value of the human health benefits of the proposed ELG Rule. EIP has also published a series of reports documenting coal ash "damage cases," which include many cases of surface water impacts from coal ash.

8.     In addition to informing the public about discharges of pollution from power plants and other industrial facilities through reports, EIP represents citizens and groups, on a pro bono basis, whose health, recreational, aesthetic and other environmental interests are harmed by coal-burning power plants and other industrial sources in their communities. Among other things, EIP advocates on behalf of these citizens and groups by reviewing permits required under the Clean Water Act and challenging them when necessary, and by bringing enforcement actions when sources violate conditions of state-issued permits or federal law.

9.     Our ability to carry out our mission, and specifically our ability to provide legal assistance to people affected by coal ash pollution, is directly dependent on the extent to which EPA carries out its statutory mandate under the

3

Clean Water Act, including the extent to which EPA regulations protect human health and the environment consistent with the Clean Water Act's requirements.

10.     The revised ELG Rule imposes new limits on toxic coal ash pollutants in unmanaged leachate and some so-called "legacy wastewater" that was, until recently, only subject to case-by-case limits derived using permit writers' best professional judgment. The ELG Rule's establishment of uniform, national effluent limitations based on best available technology that must be incorporated into all power plant permits creates a "floor" of protections that will allow EIP to make more effective use of its limited resources, because we will not have to review or challenge case-by-case determinations of best available technology, or the lack thereof, when advocating for greater protections for downstream communities. EPA erred, however, by exempting unmanaged leachate, and some power plants that opt to retire before a certain date, from limits that require the use of the best available technology to minimize or eliminate wastewater discharges.

11.     Because our ability to carry out our mission depends on EPA's adherence to its Clean Water Act mandate, EIP invested substantial time and effort to push EPA to issue a strong ELG Rule.  In 2009, EIP notified EPA of our intent to sue the Agency for failing to meet its statutory obligation to review and, as appropriate, revise, the Effluent Limitations Guidelines for the Steam Electric Power Generating Category.  We then participated in litigation and negotiations

4

that resulted in a consent decree establishing a deadline for EPA to promulgate a final ELG Rule.

12. During subsequent ELG rulemakings, EIP submitted comments on proposed rules, released public reports about the significance, strengths, and weaknesses of the proposed rules, and met with EPA and other government actors to advocate for a strong regulations with stringent limits.

13. EIP has an organizational interest in federal regulations that require the use of the best available technology, as required by the Clean Water Act – not just for the coal industry, but for all industries. EIP's interests would be harmed if the Steam Electric ELGs were weakened, providing potential precedent for weaker ELGs in other industries; conversely, EIP's ability to advocate for stronger ELGs in other industries would be strengthened if EPA were required to close loopholes for "unmanaged" leachate and plants that retire before a certain date and fully implement its mandate under the Clean Water Act with respect to the Steam Electric industry.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 28rd day of October, 2024.


Jennifer Duggan, Executive Director
Environmental Integrity Project

5

*PennEnvironment, Inc.*

# DECLARATION OF KURT LIMBACH

I, Kurt Limbach, declare and state as follows:

1. I am over 18 years of age. The information in this declaration is based on my personal knowledge and my review of publicly available information.

2. I live at 350 Creek Road, Bolivar, PA. I have lived at this address since 1990.

3. My home is located on approximately 295 acres of land, portions of which overlook the Conemaugh River. I chose to make this part of Western Pennsylvania my home because of the quality of life that living here provides me. In particular, I value the opportunities for outdoor recreation and connection with the natural environment.

4. I have been a PennEnvironment member since 2002. I joined PennEnvironment because they work to limit pollution and uphold the law in Pennsylvania. I worked with PennEnvironment on a successful suit in 2007 against the Conemaugh Plant, which was violating its discharge limits for metals in the Conemaugh River so PennEnvironment and Sierra Club sued them.

5. I have been a Sierra Club member since 1996. I joined Sierra Club because of my interest in environmental activism and because I see the tremendous environmental destruction from pollution in Western Pennsylvania. I know there's another, better way to do things and to generate electricity, and I

1

appreciate the fact that Sierra Club fights for that and for the protection of our natural resources.

6. My home is located less than four (4) miles from the Conemaugh Generating Station.

7. I am aware that water pollution and effluent discharges from coal-fired power plants contribute to a wide range of negative public health and environmental effects. I know that pollutants such as arsenic, mercury, and selenium have been linked to adverse health impacts and that these and numerous other harmful pollutants are discharged into the Conemaugh River from the Conemaugh power plant. I am deeply concerned about water pollution from this large source and about the health effects of exposure to toxins in its discharges.

8. In the past, I have regularly kayaked on the Conemaugh River downstream of the Conemaugh Generating Station. I enjoy kayaking this stretch of the river given its close proximity to my home, because of the Class 1, 2, and 3 rapids that make for enjoyable paddling, and because of the natural beauty surrounding that part of the river. I plan to spend time this summer kayaking this section of the river; I generally kayak between May and July when river water levels are sufficiently high. I often would like to get out of my kayak and go for a swim when it's hot outside, however, I avoid swimming in the river because of my concerns with the polluted effluent discharges from the

2

Conemaugh plant and so as to limit the levels of pollution to which I am potentially exposed. It would be nice to spend more time on the Conemaugh River near my house; it's such a beautiful area, but the river itself is so damaged and polluted it degrades my experience.

9. Although I enjoy fishing, I avoid doing so on the Conemaugh River because of the water pollution and my concern that the fish will be polluted with toxins. In fact, because of the pollution in my stretch of river—only a couple miles downstream of the Conemaugh plant, there are limited fishing opportunities; the river is basically dead for aquatic life, even bugs you would expect to see on the water are largely nonexistent. There are pockets here and there where you may find a couple fish (for instance where cleaner feeder streams hit the main branch of the Conemaugh) but, for most stretches of the river, you could go three or four miles and not see any fish. In addition, I know that some of the pollutants discharged from the Conemaugh power plant, such as selenium and mercury, are bioaccumulative and, therefore, I would not feel comfortable eating fish from the river downstream of the plant. I am the Secretary and on the Board of Directors of a local fish club, the Tubville Trout Club Unlimited, a 501(c)(3), and we operate in one of the waters that feeds into the Conemaugh doing activities such as teaching children how to fish. I would like to do some of the

3

same activities in the Conemaugh, but I cannot because there is no fishing opportunity—I would not eat the fish that are there.

10. I am aware that in April 2024 the U.S. Environmental Protection Agency ("EPA") revised the Steam Electric Effluent Limitations and Guidelines ("ELG") rule to add new limits on the amount of toxic metals and other harmful pollutants that facilities such as Conemaugh can discharge into our rivers and other waterways. I understand that the 2024 ELG rule would reduce water pollution in the Conemaugh River, thereby improving environmental and public health. Such improvements would also increase opportunities for ecotourism in my area and likewise positively impact property values in my community. I am also aware that the ELG rule requires plants including the Conemaugh Plant to comply with limits on toxic discharges by a certain date and that the Pennsylvania Department of Environmental Protection ("DEP") would have to include these limits in Conemaugh's next National Pollutant Discharge Elimination System ("NPDES") permit.

11. The 2024 ELG rule would require DEP to incorporate new limits on coal ash pollution – specifically, coal combustion residual leachate – when it next renews the NPDES permit for the Conemaugh Generating Station, which would benefit me. I understand that Conemaugh is currently scheduled to retire before 2028, but I am concerned that the plant's owners might opt into one of the new

4

rule's subcategories that would allow the plant to discharge leachate with less treatment. I would worry less about my health and the health of my friends and family and would be able to more fully enjoy the stretch of Conemaugh River near my home with stricter limits in place for this plant's discharges. I would kayak more, fish more, and my property would likely be worth more. I, and my whole community, would benefit from the resulting improvement in water quality and from knowing that Conemaugh's permit would be renewed with additional limits for toxic metals and pollutants known to be discharged by coal-fired power plants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of October, 2024.

Kurt Limbach

5

# DECLARATION OF DAVID MASUR

I, David Masur, declare and state as follows:

1.      I am over 18 years of age and competent to give truthful testimony.  I have personal knowledge of the facts provided below.

2.      I am the Executive Director of PennEnvironment, and have been since 2002.  I am responsible for staff management, strategic planning, direct advocacy on our environmental agenda, and the day-to-day operations of the organization.  I also oversee any environmental litigation in which PennEnvironment is involved.

3.      PennEnvironment is a Pennsylvania non-profit corporation organized for the purpose of conducting public interest research, policy development and analysis, public education, litigation, and advocacy to protect the environment and people of Pennsylvania, including the quality of Pennsylvania's water.  Its principal place of business is 1528 Walnut Street, Suite 1400, Philadelphia PA 19102.  PennEnvironment was formed in 2002 to carry on the environmental work previously conducted by the Pennsylvania Public Interest Research Group. PennEnvironment currently has approximately 15,000 members in Pennsylvania.

4.      Protecting the quality of Pennsylvania's waters has been one of PennEnvironment's lead environmental priorities.  PennEnvironment regularly engages the Pennsylvania Department of Environmental Protection ("DEP") regarding Clean Water Act issues, reviews DEP and U.S. Environmental

Appellate Case: 24-2246     Page: 57     Date Filed: 11/07/2024 Entry ID: 5454499

Protection Agency ("EPA") files on Pennsylvania facilities that have National Pollutant Discharge Elimination System ("NPDES") permits, and releases reports on water quality in Pennsylvania. In 2007, PennEnvironment filed a successful suit in federal court alleging thousands of illegal discharges of pollutants including metals such as selenium from the Conemaugh Generating Station. In 2011, we won our case and the court ordered the Conemaugh Plant's to pay $3.75 million, $3.5 million to restore the Conemaugh River and an additional $250,000 in civil penalties.

5.     PennEnvironment undertakes its clean water programs on behalf of its members. Its efforts to promote clean water are directly responsive to the interests of its members, who have indicated repeatedly that this is a high priority for them. Because many of its members become citizen activists in support of PennEnvironment's programs, PennEnvironment works to keep its members informed and to hear their concerns. Through PennEnvironment, individual citizens are able to act collectively and to speak with a more powerful voice.

6.     People often decide to join PennEnvironment after a canvasser comes to their door to discuss the organization and to offer them the opportunity to become a member, or after they hear a PennEnvironment staffer speak about the organization's campaigns or projects at a local meeting. PennEnvironment members join by paying a membership fee, and they are asked to renew that

financial commitment each year. PennEnvironment regularly communicates with its members to inform them about new developments, to encourage them to become engaged in its work, and to solicit their feedback. Such communication takes the form of door-to-door canvassing, newsletters, annual reports, interactive email action alerts, member appreciation events, member surveys, advisory committees, and events where members interact with experts from the environmental, labor, business, or political fields. PennEnvironment relies on the input of its members in shaping its policy priorities, and the pursuit of litigation to enforce the Clean Water Act has always received strong member support.

7.     Many of PennEnvironment's members live, fish, swim, kayak, and enjoy the wildlife along the waterways immediately downstream from coal plants in Pennsylvania. Our members are concerned about the quality of the fish they eat, the quality of the water they swim in, and the health of the environment that they are a part of.

8.     I, like many of PennEnvironment's members, am concerned about the pollutants in coal ash wastewater, including heavy metals like mercury and selenium, and other pollutants, that can be toxic to humans and wildlife. I know that many of these pollutants bioaccumulate, making fish unsafe to eat.

9.     I am aware the EPA finalized a regulation limiting water pollution from power plants in April 2024. I know that the rule would require new limits on

Appellate Case: 24-2246     Page: 59     Date Filed: 11/07/2024 Entry ID: 5454499

discharges of coal combustion residual leachate from the Conemaugh Plant. I also know, however, that EPA created loopholes from the generally applicable limits – loopholes that might allow for more pollution from plants like Conemaugh, especially if it becomes apparent that Conemaugh is discharging unmanaged leachate or if the plant's owners opt into a "retirement by 2034" subcategory, keeping the plant open longer and discharging more pollution with weaker limits.

10.     I am concerned that these loopholes and any weakening of the rule will expose PennEnvironment members to more pollution than they would otherwise be exposed to.  This will lead to an increased risk of cancer and other health effects to PennEnvironment members who eat fish from affected waterways, an increased risk to the health of the wildlife that PennEnvironment members regularly enjoy, and a general degradation of the environment that I and my organization work so hard to protect, including in the areas downstream of the Conemaugh Plant.

I declare under penalty of perjury, this 28th day of October, 2024, that the foregoing is true and correct.

David Masur

*Prairie Rivers Network*

# DECLARATION OF DON DAVIS

I, Don Davis, declare and state as follows:

1.      I am over 21 years of age and suffer from no impairment or disability affecting my ability to give truthful testimony. I have personal knowledge of the facts set forth below.

2.      I am a member of Prairie Rivers Network. I have been a member since 2014. I joined Prairie Rivers Network in 2014 because I am a landowner on the Sangamon River floodplain and I am concerned about mercury and other toxic metals accumulating in the food web of the local environment. I have been involved in conservation efforts since the 1970s and I also recreate and fish on Illinois rivers, so I have an interest in preserving the integrity of natural ecosystems and also in making them safe for fishing and other uses.

3.      I reside at 6363 Stagecoach Road, Pleasant Plains, IL, 62677. I have lived at this address since 1994. I have lived in the Springfield area my whole life.

4.      My wife and I are co-owners, along with two other couples, of a land right on 185 acres along the Sangamon River, roughly 20 miles downstream from where Sugar Creek enters the Sangamon. We have been co-owners since 2002. The 185 acres have been under a conservation easement since before we became co-owners. We have managed the land as part of the Conservation Reserve

1

Enhancement Program, which is a state and federal cooperative effort to improve water quality and reduce sediment and nutrient loads on the Sangamon River.

5. I know that the coal plant known as Dallman Station, also known as City, Water, Light and Power, discharges wastewater into Sugar Creek and, indirectly, to the Sangamon River. I know that the wastewater from Dallman Station contains heavy metals and other pollutants from coal ash. Water pollution from Dallman Station flows through Sugar Creek into the Sangamon River, and ultimately through the 185 acres that I co-own. Our land is in a floodplain. Sediment in the river, which includes pollution from Dallman Station, frequently redeposits on our land. Pollutants in the river and in sediment also accumulate up the aquatic and terrestrial foodchains into the fish and game that my family eats.

6. Of the co-owners of the land right, I get the most recreational use of the area. My family and I all fish in the Sangamon River. We fish within the 185-acre area that we co-own, and we also fish further upstream, as far upstream as the Route 29 bridge. I do not fish closer to Sugar Creek because I am concerned about the mercury, lead, cadmium, and other heavy metals from coal ash that are in the water.

7. My family and I also hunt in the area. We hunt and eat deer, turkey, and squirrels that use the Sangamon River as a water supply. Since we are on a

food chain that starts with the Sangamon River, I am concerned about the heavy metals and other pollutants that I am being exposed to.

8.      I know that the Environmental Protection Agency set new pollution limits for coal plants in April, 2024, including limits on unmanaged coal ash leachate from plants like Dallman. I am concerned that these limits are not as strong as they should be. I am also concerned that Dallman's owner might opt into an early retirement subcategory to take advantage of weaker limits. I oppose weaker limits on unmanaged leachate and on coal plants in the early retirement subcategory because I believe weaker limits will directly harm my family, my community and myself by increasing the amount of pollution that we might be exposed to.


I declare, under penalty of perjury, that the foregoing is true and correct. Executed on this _____ day of October, 2024.

_____

Don Davis

Appellate Case: 24-2246      Page: 64      Date Filed: 11/07/2024 Entry ID: 5454499

## DECLARATION OF MAGGIE BRUNS

I, Maggie Bruns, declare and state as follows:

1. I am over 21 years of age and suffer from no impairment or disability affecting my ability to give truthful testimony. I have personal knowledge of the facts set forth below.

2. I am the Executive Director of Prairie Rivers Network (PRN), serving in this position since 2023. PRN advocates for clean water and healthy rivers for the people, fish and wildlife of Illinois and is the independent state affiliate for Illinois of the National Wildlife Federation.

3. PRN works to protect water, heal land, and inspire change. Using the creative power of science, law, and collective action, PRN protects and restores our rivers, returns healthy soils and diverse wildlife to our lands, and transforms how we care for the earth and for each other. We work to protect water quality and river health from the impacts of coal waste pollution and the toxic chemicals which can leach from coal ash ponds into groundwater, lakes and river, polluting drinking water supplies and threatening fish and wildlife.

4. PRN helped develop and is engaging in the implementation of Illinois's coal ash rules (called Part 845). We submitted comments and attended the hearing of the first Part 845 hearing in Powerton. PRN regularly submits comments to ensure that National Pollution Discharge Elimination System (NPDES) permit renewals for major polluters comply with the law. PRN has also brought lawsuits on behalf of its members to combat illegal and unsafe discharges of water pollutants from fossil-fuel-burning facilities. For example, we've commented on NPDES permits for many Illinois coal-fired power plants, including Springfield, Newton, Meredosia, Powerton, Vermilion, Coffeen and Waukegan. We've brought lawsuits against coal-fired polluters, such as our groundwater violation case against four Midwest Generation plants, a Clean Water Act lawsuit at the Vermilion site, and an Environmental Protection Act lawsuit at the Vermilion site.

5. Prairie Rivers Network is a membership based non-profit organization, with members across Illinois. PRN's over 1000 members use Illinois' many rivers for fishing, swimming, boating, drinking, and enjoying wildlife. Many of our members live and recreate downstream of plants that would need to update limits for the ELG rule, and would be adversely affected by the discharge of pollutants that degrade water quality.

6. I am aware that in April, 2024 the U.S. Environmental Protection Agency (EPA) promulgated revisions to the Steam Electric Effluent Limitations and Guidelines (ELG) rule to limit the amount of toxic metals and other harmful pollutants that facilities such as Dallman in Springfield, IL can discharge into our rivers and other waterways.

7. I know that many of the pollutants in coal ash wastewater bio-accumulate, building up to unsafe levels in fish and other species. These pollutants, and other coal ash pollutants, threaten the health of PRN members who fish in Illinois waterways, and who drink water from Illinois waterways, and also threaten the wildlife that PRN members regularly enjoy while recreating on Illinois waterways.

8. I am concerned that the new ELG rule could be weakened in response to challenges from the regulated industry. I am also concerned that the rule does not go far enough to limit pollutants in some waste streams, like unmanaged leachate, and could provide loopholes with much weaker limits for plants like Dallman that choose to retire before a certain date. These aspects of the rule and any weakening of the rule in response to industry challenges would allow coal plants to release more toxic pollution into the water, exposing PRN members and wildlife to higher levels of pollution than they would otherwise be exposed to. This, in turn, would increase the likelihood that PRN members will

experience adverse health effects and a diminished ability to enjoy Illinois'
ecological wealth.

I declare under penalty of perjury that the foregoing is true and correct, to
the best of my knowledge, belief, and recollection, pursuant to 28 U.S.C. § 1746.

Executed on this 31st day of October, 2024.

Maggie Bruns

*Winyah Rivers Alliance*

# DECLARATION OF ROBERT CIMINEL

I, Robert Ciminel, under penalty of perjury, declare as follows:

1. My name is Robert Ciminel. I have personal knowledge of the matters stated herein. I am over the age of 18, and I am competent to give this declaration. This declaration is based on my belief and personal knowledge of the facts below.

2. I live in Pawleys Island, South Carolina. I have lived here for ten years, and I have been visiting this area since 1972. My wife grew up here and her family has owned land on the Sampit River for generations.

3. I retired after working for 50 years in commercial electric production, primarily nuclear. I worked briefly at a fossil plant.

4. When I retired and moved here, I got involved with many outdoor activities. I started volunteering doing sea turtle monitoring, leading salt water fishing clinics, and working with Winyah Rivers Alliance and other organizations.

5. I have been a member of Winyah Rivers Alliance for about six years. I conduct sampling and lead sampling trips for the Alliance along the length of the Sampit River, from its headwaters to where it empties into Winyah Bay.

6. I consider myself a naturalist. I lead hikes as a guide around Winyah Bay, and I do cleanups around the Bay and surrounding marshes, as well as in the city parks along the shoreline of the Sampit River. I have also led boat tours on Winyah Bay.

7. I work as a fishing guide in the marshes connected to Winyah Bay, as well as in the open water. I teach catch and release clinics. We catch bottom feeders and I know that the pollutants in the water will be present in those fish. I would not eat fish caught in the marshes around Winyah Bay or in the open water because of my concerns about pollution.

8. I enjoy observing wildlife in Winyah Bay, including shorebirds, alligators, bald eagles eating fish, porpoises, cormorants, anhingas, and turtles.

9. I do not see a lot of wildlife on the Sampit River. I consider it to be an industrial river. There is cumulative pollution from the Winyah power plant, a steel mill, a paper mill, and other sources. The Sampit is the biggest source carrying pollution into Winyah Bay, and I am concerned that the water pollution is harming the wildlife in the river and in Winyah Bay.

10. I am aware that the Winyah power plant is authorized to discharge arsenic, mercury, selenium, and other pollutants from its air scrubbers, coal ash, and other industrial discharges to the Sampit River via Turkey Creek.

11. I am also aware that the U.S. Environmental Protection Agency recently issued a new water pollution rule setting limits for coal-fired power plants that would allow the

1

Appellate Case: 24-2246   Page: 70   Date Filed: 11/07/2024 Entry ID: 5454499

Winyah plant to continue discharging arsenic, mercury, selenium, and other pollutants for as much as ten more years. I am aware that the new rule requires other coal-fired power plants to eliminate these discharges of water pollution. Santee Cooper keeps extending the operational life of the Winyah power plant. If Santee Cooper is going to continue operating the plant into the next decade, it should be required to control its water pollution discharges in the same way as other coal-fired power plants that are not retiring any time soon.

12. The Sampit River and Winyah Bay cannot be cleaned up while pollution from the Winyah power plant continues. As long as the Winyah plant keeps discharging heavy metals and other pollutants, pollution will continue accumulating in these waters. If the pollution levels in Winyah Bay go up, it will affect the wildlife I enjoy observing and the fish I enjoy catching, reducing my enjoyment of these activities. I am concerned about the effects of the Winyah plant's water pollution on these species. I am concerned about the plant's discharges of pollution to the river as well as pollution from the plant's air emissions, which predominantly blow in the direction of the river.

13. A court order that requires EPA to close the loophole in its wastewater discharge rule for power plants operating until 2034, and instead apply the new rule's zero discharge limits to the Winyah plant, would address my concerns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _JUNE 16_, 2024.

_Robert Ciminel_
Robert Ciminel

2

**DECLARATION OF DEBRA BUFFKIN**

I, Debra Buffkin, under penalty of perjury, declare as follows:

1. My name is Debra Buffkin. I have personal knowledge of the matters stated herein. I am over the age of 18, and I am competent to give this affidavit. This declaration is based on my belief and personal knowledge of the facts below.

2. I am the Executive Director and a member of Winyah Rivers Alliance. Before I became the Executive Director in 2022, I was a board member for the organization.

3. Winyah Rivers Foundation, Inc. (d/b/a Winyah Rivers Alliance) is an alliance of Riverkeepers who protect our rivers for fishing, swimming, and drinking.

4. Winyah Rivers Alliance is a member and licensee of Waterkeeper Alliance.

5. Winyah Rivers Alliance is 501(c)(3) nonprofit organization whose mission is to protect, preserve, monitor and revitalize the health of the lands and waters of the greater Winyah Bay watershed. We work to protect clean water, encourage good stewardship, and conserve our land and water for the benefit of our families and our future. My job as Executive Director includes ensuring that the Alliance carries out that mission.

6. I became involved with the Alliance because I love the rivers and ecology in and around the Winyah Bay watershed and see them as a vital part of my community. These rivers are an invaluable cultural and recreational resource to me, my family, and many others who live along them, and I am passionate about my role in protecting them from contamination and other harms.

7. For many years, Winyah Rivers Alliance and our members have been concerned about water pollution from power plants. We participated as petitioners in a legal challenge to the weakened 2020 Effluent Limitation Guidelines for coal-fired power plants. And we

have participated as plaintiffs in state and federal lawsuits against Duke Energy and Santee Cooper for their coal ash pollution in our watershed; after years of litigation we succeeded in obtaining full cleanups of the coal ash lagoons at all of these sites, including the coal ash lagoons at Santee Cooper's Winyah power plant.

8. I understand that the new Effluent Limitation Guidelines rule for power plants finally includes stringent requirements based on the best available technology for eliminating many forms of harmful wastewater pollution from these plants, but I also understand that it exempts any power plant planning to retire in the next decade, until the end of 2034—which would include the Winyah Generating Station in our watershed—from these protective requirements. For plants subject to that exemption, I understand that the rule retains the inadequate effluent limitations from the prior rule. This is a major setback to our organization, to our members, and to our Sampit and Winyah Bay communities. These weakened standards for power plant wastewater, when the technology is available to remove more of the pollution, directly harms our efforts to protect and restore the greater Winyah Bay watershed and to protect the communities that rely on its natural resources.

9. The Sampit River, the shortest of our Pee Dee Basin Rivers, provides important recreational fishing opportunities and contributes to commercial fisheries in Winyah Bay. Yet the Sampit River faces industrial pollution that degrades water quality and harms vulnerable wetlands in the area. State regulators have put fish consumption advisories on the River because of pollution. One major source is the Winyah plant, which has been discharging pollutants to this watershed for several decades and continues to do so.

10. Our members share these concerns. Pollution from the Winyah plant reduces our members' use and enjoyment of our water resources. Winyah Rivers Alliance and our

members have submitted comments and participated in public meetings for years advocating for power plants to reduce water pollution. These concerns will persist as long as the Winyah plant is authorized to dump polluted wastewater into our water without more protective limits.

11. An order from this Court vacating the 2034 exemption in the rule will redress Winyah Rivers Alliance's injuries.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on September <u>19</u>, 2024.



Debra Buffkin

*Catawba Riverkeeper*

# DECLARATION OF CHARLES CAMPBELL

I, Charles Campbell, under penalty of perjury, declare as follows:

1. My name is Charles Campbell. I have personal knowledge of the matters stated herein. I am over the age of 18, and I am competent to give this declaration. This declaration is based on my belief and personal knowledge of the facts below.

2. I have lived in Cornelius, North Carolina for about 15 years. My home is a short distance from Lake Norman.

3. I am a member of Catawba Riverkeeper. I serve on Catawba Riverkeeper's Board of Directors, and I regularly volunteer with the organization, leading trash cleanups at local parks and on islands in Lake Norman. I also assist with the annual Riverfest event and with Catawba Riverkeeper's fundraising events in Charlotte.

4. Lake Norman is an important part of why I value where I live. I am an active kayaker, stand-up paddle boarder, and boater. I am out on Lake Norman at least every other weekend during the season. I enjoy observing nature on the lake, and regularly visit uninhabited islands in the lake to grill or just relax. I also swim in the lake with my kids frequently. I also kayak on the Catawba River south of Lake Norman at least annually.

5. I also enjoy activities along the lakeshore. I walk my dog along the lake every day. I mountain bike along the lake, including at the Whitewater Center. I also go rafting at the Whitewater Center, which pulls its water from the lake. And I do lots of hiking at parks on the lake, such as Lake Norman State Park and the Latta Plantation. When I do these activities, I enjoy observing wildlife and the natural environment of the lake.

6. I do all of these recreational activities downstream of Duke Energy's Marshall power plant. My home is about three miles downstream from the plant, and I regularly boat or kayak near the plant.

7. I am aware that the Marshall power plant discharges arsenic, mercury, and other pollutants into Lake Norman. I will not eat fish caught in Lake Norman because of my concerns about the water pollution, including fish consumption warnings about mercury in the lake. I am also concerned about the effects of this pollution on my health and ability to enjoy recreation on and in the lake, on my family, on the natural ecosystem, and on the value of my home. I am aware that heavy metals and other pollutants can accumulate in wildlife and people, and I worry that continued pollution from the Marshall power plant could harm my and my family's health, and that it will degrade the natural environment and make boating, kayaking, swimming, and observing nature on the lake less enjoyable.

8. I am also aware that the U.S. Environmental Protection Agency recently issued new wastewater pollution limits that prohibit discharges of water pollution from many power plants, but contain an exception that allows plants like Marshall that plan to keep operating until as late as 2034 to continue discharging heavy metals and other pollutants.

1

9. A court order that requires EPA to eliminate the exception in its wastewater discharge rule for power plants operating until 2034, and instead apply the new rule's zero discharge limits to the Marshall plant, would address my concerns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___June 18___, 2024.

_____
Charles Campbell

2

Appellate Case: 24-2246    Page: 77    Date Filed: 11/07/2024 Entry ID: 5454499

## DECLARATION OF JOHN SEARBY

1.      My name is John Searby. I have personal knowledge of the matters stated herein. I am over the age of 18, and I am competent to give this declaration. This declaration is based on my belief and personal knowledge of the facts below.

2.      I am the Executive Director and CEO of Catawba Riverkeeper.

3.      Catawba Riverkeeper is a § 501(c)(3) nonprofit public interest organization operating in North Carolina and South Carolina with its headquarters in McAdenville, NC. Catawba Riverkeeper operates in the 24 counties of the Catawba-Wateree River watershed in South and North Carolina. Catawba Riverkeeper has members in North and South Carolina, including members who live and recreate on Lake Norman.

4.      Catawba Riverkeeper is a member and licensee of Waterkeeper Alliance.

5.      Catawba Riverkeeper's mission is to preserve, protect, and restore the waters of the Catawba-Wateree River basin for all through education, advocacy, and engagement. Catawba Riverkeeper is the sole Riverkeeper for the entire Catawba watershed, including the portion of the river that has been impounded to form Lake Norman. Catawba Riverkeeper works to improve the health of the Catawba-Wateree River watershed through water quality monitoring and conservation advocacy, and works to increase public awareness through education and partnerships with other community and conservation groups. Catawba Riverkeeper comments on permits, regulatory proposals, and government actions that affect the Catawba River watershed, including those related to the Marshall Steam Station on Lake Norman. Such public participation is an essential part of Catawba Riverkeeper's work and an important way through which it carries out its mission.

6.      Catawba Riverkeeper has members throughout the Catawba Basin and watershed, including members who live on or near Lake Norman. Members of Catawba Riverkeeper enjoy

and make use of Lake Norman downstream from the Marshall power plant as well other portions of the Catawba River downstream from the plant.

7.     As part of its mission, Catawba Riverkeeper patrols the shoreline of Lake Norman for environmental violations and dumping. Catawba Riverkeeper samples the water quality of Lake Norman. Catawba Riverkeeper regularly performs cleanups and monitoring activities on Lake Norman. Catawba Riverkeeper also trains members to serve as "Water Watchers" including on Lake Norman. Those members patrol the coves along the lake and work to keep them clean.

8.     Catawba Riverkeeper has long been concerned about wastewater and pollution from Duke Energy's coal-fired Marshall power plant on Lake Norman. Catawba Riverkeeper's then-Executive Director testified at the U.S. EPA's 2010 coal ash hearings in Charlotte about coal ash contamination at Marshall and other sites on the Catawba River, and why the activities at these sites illustrated the need for stricter regulations at the federal level. We participated as plaintiffs in state and federal litigation against Duke Energy for its coal ash pollution on our river, including at the Marshall site, and succeeded in obtaining cleanups of all these coal ash sites. Catawba Riverkeeper commented on previous versions of the Effluent Limitation Guidelines, including the weakened limits in the 2020 ELG Rule that would be left in place by the loophole in the current ELG Rule for plants retiring by 2034.

9.     I understand that the new ELG Rule includes stringent requirements to eliminate many forms of harmful wastewater pollution from coal-fired power plants. However, I understand that the rule also exempts any power plant planning to retire by the end of 2034—which would include the Marshall plant—from these protective requirements. For plants subject to that exemption, I understand that the rule retains the weakened effluent limitations from the 2020 Rule.

This failure to apply available technology-based limits to stop wastewater pollution harms our organization and our members. These weakened standards for power plant wastewater, when the technology is available to remove more of the pollution, directly undermines our efforts to protect and restore the Catawba River watershed. An order from this Court vacating the 2034 exemption in the rule will redress Catawba Riverkeeper's injuries.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 1, 2024.

_____

John Searby

# Center for Biological Diversity

## DECLARATION OF TIERRA CURRY

I, Tierra Curry, state and declare as follows:

     1.     This declaration is based on my personal knowledge and belief. I am over the age of eighteen and competent to testify.

     2.     I am a resident of Somerset, Kentucky. I have a Bachelor of Arts degree in English from Berea College in Berea, Kentucky, and a Master of Science degree in Biology from Portland State University. My graduate research focused on the management of freshwater habitats in relation to the reproductive success of imperiled aquatic species. Before joining the Center in 2007, I worked as an environmental educator and freshwater biologist focused on the restoration and management of freshwater ecosystems in Oregon and Washington.

     3.     I am a member of the Center for Biological Diversity and have been a member since 2004. I have worked as a biologist for the Center now for more than 16 years total, and I rely on the Center to represent my interests in restoring and safeguarding freshwater rivers, lakes, creeks, and streams for both people and wildlife. As a senior scientist, I lead the Center's Southeast freshwater extinction campaign which focuses on protecting freshwater environments and the unique web of life that relies upon clean water in the southeast.

     4.     The southeastern United States is globally significant hotspot for freshwater biodiversity, harboring amazing and unique species found nowhere else.

1

The beautiful rivers of the southeast support an amazing array of wildlife including fish, salamanders, crayfish, mussels, river snails, turtles, and aquatic insects. Many of these species rely on water free of chemicals pollutants known to discharge from power plants.

5.     Sickle darters and spotfin chubs are beautiful fish with interesting life histories, as the males of both species develop more contrasting coloration during the breeding season and employ mating rituals to attract females. Both the sickle darter and the spotfin chub are threatened by pollution, as they both rely on clean, freshwater river bottoms to complete their life cycles. Hellbenders, the largest salamanders in North America, are sentinels for clean rivers, as they can only reproduce in waterways that are free of silt and pollutants. Specialized for living on the bottom of swift, cold, clean river bottoms, they are one of my absolute favorite species.

2


Male hellbender guarding his rock cavity, photo by Tierra Curry.

6. Freshwater mussels are among the most fascinating and underappreciated wildlife. They play important roles in rivers by filtering water, stabilizing substrate, and enhancing the food web. Mussels are filter feeders that can accumulate contaminants in the water as they breathe and feed, and consequentially, are threatened by water pollution that has historically wreaked havoc on these clean-water-loving animals. These are just some of the many unique critters that represent the diverse web of life supported by southeastern rivers. I am concerned that the continued discharge of heavy metal pollution from power plants will harm these species and hundreds of other rare and imperiled wildlife that rely on the aquatic ecosystem. I also am worried about the continued

Appellate Case: 24-2246    Page: 84    Date Filed: 11/07/2024 Entry ID: 5454499

decline of these species, which would make it much harder to observe them in their natural habitat.

7. While I work to protect mussels, fish, and amphibians in the freshwater ecosystems they inhabit, I immensely enjoy outdoor recreation on rivers. I enjoy kayaking, paddleboarding, swimming in rivers, and looking for wildlife. Swimming in particular is one of my favorite pastimes. In the summer of 2021, I swam in 108 rivers in Kentucky, Tennessee, Virginia, West Virginia, Georgia, Maryland, Pennsylvania, and North Carolina. When I am swimming in, wading near, or walking beside these rivers, I am always on the lookout for unique and imperiled wildlife that rely upon freshwater rivers for habitat, food, or reproduction.

8. I have continued to swim in rivers across the United States since. I live on and regularly swim in the Cumberland River, home to a rich array of freshwater mussels and fish. While I live on the Cumberland River, I continue to visit the rivers near my home and across the United States, including the Emory, Green, Ohio, Kanawha, Kentucky, St. Croix, Clinch, Cheat, Cherry, Cranberry, Elk, Laurel, Licking, Greenbrier, Holston, Obed, Duck, Powell, Buck Creek, Williams, and Rockcastle, just to name a few.

9. Since moving to Kentucky in 2020, I've regularly visited the Clinch and Emory rivers every year to swim and to look for freshwater mussels, crayfish,

4

and fish, and other animals. The Emory and Clinch rivers are just a few hours from my home, and both rivers are important habitat for dozens of species of imperiled fish and mussels, including the unique spotfin chub. I plan to continue to visit those rivers regularly because of their beauty and importance as wildlife habitat. However, the intersection of the Emory and Clinch River is occupied by the Kingston Coal Plant, which discharges toxic pollutants directly into the aquatic environment, and under the Environmental Protection Agency's supplemental rule updating the steam-electric effluent limitation guidelines, will continue do harm the aquatic ecosystems and wildlife I care deeply about. Knowing that this power plant is discharging chemicals into these rivers harms my own personal enjoyment of these rivers, as I am injured because pollution makes me deeply concerned not only the web of life supported by these rivers, but about the chemicals impact on my own health and well-being.

  10. Similarly, under the supplemental rule, the E.W. Brown plant on the Kentucky River and the Mill Creek, Miami Fort, Rockport, and F.B. Culley Generating Plant that abut the Ohio River – both rivers I live close to and regularly recreate on – will continue to discharge heavy metals like arsenic, lead, mercury, and selenium that contaminate the places I swim. Wastewater from these powerplants can cause significant damage to the aquatic ecosystem, further degrading the habitat that freshwater species rely upon which makes them much

Appellate Case: 24-2246  Page: 86  Date Filed: 11/07/2024 Entry ID: 5454499

harder to see. I recreate on the Kentucky River regularly including in March, April, July, and September of this year. I visited the Ohio River in March and will return in November. I visited the Emory River in August and will return in December. I have plans to return to the Clinch River in June of 2025.



Butterfly mussel shell and pimpleback mussel shell on the Kentucky River

11. I am distressed that the Environmental Protection Agency has allowed these power plants to continue discharging higher levels of pollution into the water by allowing the continued use of cheaper, less effective pollution control

6

technologies. Coal power plants represent one of the most significant industrial source of toxic water pollution in the United States, and I am concerned that allowing these plants to skirt protections required under the Clean Water Act for a decade — and for certain leachate discharges potentially indefinitely— will increase pollution loads and cause habitat degradation for rivers and freshwater species that I care about including spotfin chub in the Emory River, and the plethora of rare and imperiled mussels in the Kentucky and Ohio rivers. I derive great personal enjoyment from the unique web of life supported by southeastern rivers, and I am harmed by the unabated power plant pollution that reduces my aesthetic, personal, and recreational enjoyment in swimming in these rivers and seeing the wildlife they support.

12. Knowing that these power plants are discharging heavy metals without updated safeguards also causes me psychological harm because I worry that the water I swim in is likely contaminated with heavy metals and I am concerned about the effects of pollutants like arsenic and lead on my health. This makes me less likely to swim in many rivers I previously visited, diminishing my enjoyment of one of my favorite outdoor activities.

13. If Environmental Protection Agency were to require retiring power plants to follow the same technology-based requirements under the Clean Water Act that limit discharges of toxic heavy metals into our waters, it could prevent a

Appellate Case: 24-2246    Page: 88    Date Filed: 11/07/2024 Entry ID: 5454499

decade worth of heavy metal pollution from flowing into the Clinch, Emory, Kentucky, and Ohio rivers. This would prevent significant habitat and water quality degradation in the rivers I care about, which would allow me to continue swimming, recreating, and viewing wildlife dependent on these aquatic ecosystems.

14.     My interests in observing imperiled wildlife and recreating in the aquatic habitats they rely on would not be harmed if the Environmental Protection Agency had required all power plants to adopt technology-based limitations, as I am more likely to recreate on these rivers and observe wildlife knowing that measures have been taken to limit pollution into these waterways.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of October, 2024, in Somerset, Kentucky.


_____

Tierra Curry

# DECLARATION OF BRETT HARTL

I, Brett Hartl, make the following declaration:

1.     I am a resident of Prescott, AZ.

2.     I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

3.     I am the Government Affairs Director at the Center for Biological Diversity ("Center"), and I work out of both the Center's Washington, D.C., and Arizona offices. I have been with the Center since 2013.

4.     I am also a member of the Center and have been a member of the Center since 2013. As a member, I rely on the Center to represent my interests in conserving native species and their habitats.

5.     I hold a bachelor's degree from Prescott College in conservation biology, and a law degree from Lewis and Clark Law School. Prior to law school, I spent five years as a field biologist working with endangered species in the northwest Hawaiian Islands, Kauai, and Southern California. I also worked in the House of Representatives Natural Resources Committee for Democratic staff, and I was a senior policy fellow at the Society for Conservation Biology.

6.     The Center is a member organization incorporated under the laws of the State of California. It is recognized as a not-for-profit corporation under section

501(c)(3) of the United States Internal Revenue Code. The Center has 87,138 active members across the country. The Center is based in Tucson, AZ, and works throughout the entire United States. Our other major offices are in Washington, D.C., Oakland, CA, and Portland, OR.

7.      The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law. Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction. We work to protect the ecosystems they need to survive, for the species and for the people that interact with, depend on, and cherish these natural resources.

8.      In my professional capacity as the Government Affairs Director at the Center, I monitor national policy issues that impact clean water, wildlife, endangered species, and environmental protection broadly.  This includes agency rulemaking and their policy consequences throughout the country.  I coordinate the Center's response and engagement, meet with agency officials, and work with outside stakeholders. I oversee or am involved with Freedom of Information Act requests, formal commenting, advocacy, lobbying, and litigation.

9.     Protection of clean water and the wildlife that depend on healthy aquatic ecosystems is a core organizational focus of the Center. Whether large or small, we believe all species have an intrinsic right to live. The United States and the world at large are currently in the midst of a biodiversity crisis: the diversity of life that sustains ecological systems and human cultures around the world are collapsing. As a result, the Center works tirelessly to protect endangered and threatened species through advocacy, litigation, education campaigns, conservation of critical habitats for species, and holding federal agencies accountable to their duties to protect species as directed by Congress.

10.     To that end, the Center has longstanding programs designed to protect freshwater and aquatic wildlife. For example, in July 2023 the Center petitioned the Environmental Protection Agency ("EPA") to add over 1,000 toxic and priority pollutants to the official Toxic Pollutant List under the Clean Water Act, which the EPA had failed to update since 1976. Another campaign the Center has worked on is to improve and reform the process by which the EPA establishes nationwide water quality criteria under the Clean Water Act, which are later incorporated into each state's water quality standards. The Center has brought litigation against the EPA regarding its nationwide plans to update and add new effluent limitation guidelines ("ELGs") for additional economic sectors that either do not have ELGs or where ELGs have not been updated for many decades. The Center has brought

enforcement actions under the Clean Water Act, including for example, challenging the discharge of radioactive phosphogypsum waste in Florida and the discharge of pathogens, heavy metals and pharmaceuticals from Concentrated Animal Feeding Operations in Colorado.

11.     The Center's Southeast Freshwater Extinction Campaign seeks to protect the unique and vast aquatic biodiversity of the Southeastern United States. The Southeastern United States has some of the richest aquatic fauna of any temperate area in the world, including globally significant biological diversity of freshwater mussels, freshwater fish, salamanders and other species. The Southeast contains two-thirds of North America's species and subspecies of crayfishes and contains more amphibians and aquatic reptiles than any other region. It is also home to the largest number of listed species and extinct species in the lower 48 states. For example, nearly 70% of all freshwater mussel species in North America are either protected under the Act or already extinct, and most of the remaining species are declining. One of the main drivers of the loss of freshwater mussels is heavy metal pollution, including from large facilities such as those at issue in the EPA's supplemental rule updating the steam-electric effluent limitation guidelines.

12.     The Center is particularly concerned with aspects of the Rule that allow steam electric facilities to operate without best available pollution controls if they opt in to the new 2034 retirement subcategory. As a result of this new

subcategory, numerous steam electric facilities will continue to discharge heavy metal pollutants, including mercury, arsenic, cadmium and other metals for another decade without being required to implement necessary pollution control technologies that would reduce the impacts on aquatic ecosystems and imperiled wildlife.

13.     EPA's supplemental rule for the steam electric category contains this new subcategory and other provisions that allow facilities to operate without best available pollution controls.  These provisions are likely to continue and even exacerbate harm to numerous rivers and other waterbodies across the United States, thereby harming the Center's mission to protect functioning aquatic ecosystems and injuring our members who receive aesthetic, recreational, spiritual and other enjoyment from water bodies that are not harmed by heavy metal pollution. A ruling in Environmental Petitioners' favor would require EPA to further strengthen the steam electric effluent limitation guidelines to address those aspects of EPA's supplemental rule that cause and contribute to the injury of the Center's members and would make it easier for the Center to continue to work towards its mission of protecting intact, healthy, functioning aquatic ecosystems across the United States.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of October 2024, in Prescott, AZ.

Brett Hartl
Government Affairs Director
Center for Biological Diversity